# In the United States Court of Federal Claims

No. 20-908C
Filed: November 11, 2020[1]

|  |  |
|---|---|
| **TOP GUN SERVICES, LLC,** | **Keywords:** Motion to Dismiss, RCFC 12(b)(1), Standing, AbilityOne, Competition in Contracting Act (CICA) |
| *Plaintiff,* | |
| **v.** | |
| **THE UNITED STATES,** | |
| *Defendant,* | |

*Lee Dougherty,* Effectus PLLC, Washington, D.C., for Plaintiff.

*Tanya B. Koenig,* Trial Attorney, *Douglas K. Mickle,* Assistant Director, *Robert E. Kirschman, Jr.,* Director, and *Ethan P. Davis,* Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Timi Nickerson Kenealy*, General Counsel, United States AbilityOne Commission, Arlington, VA, and *Nikki R. Musick*, Assistant General Counsel, Defense Commissary Agency, Fort Lee, VA, for Defendant.

## <u>MEMORANDUM OPINION AND ORDER DISMISSING</u>

**TAPP, Judge.**

On July 27, 2020, Plaintiff, Top Gun Services, LLC ("Top Gun"), filed this bid protest seeking injunctive and declaratory relief with respect to the Defense Commissary Agency's ("DeCA" or "Agency") "Notice to the Trade" issued on July 2, 2020 ("NTT 2020"). (*See* Compl., ECF No. 1). That Notice to Trade relates to alternative methods of stocking commissaries on ten military bases. (Compl. at 1–2). Top Gun alleges that DeCA's Notice to Trade utilizes a sole source method in violation of the Competition in Contracting Act, 10 U.S.C. § 2304. (Compl. at 1). Per that argument, Top Gun contends DeCA has deprived it of the opportunity to compete for the work it is awarding through NTT 2020. (Compl. at 19). The United States asserts that Top Gun lacks standing to bring this suit. The Court agrees.

---

[1] This Order was originally filed under seal on October 9, 2020, (ECF No. 17). The Court provided parties the opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than October 26, 2020. The Joint Status Report of October 22, 2020, (ECF No. 19), indicates that the parties propose no redactions. Thus, the sealed and public versions of this Order are identical, except for the addition of keywords, the publication date, and this footnote.

## I.     Background

*1.     Commissary Vendor Stocking*

Commissaries are grocery stores located on military bases and sell groceries at reduced prices. *See generally*, 10 U.S.C. § 2484. Top Gun provides shelf stocking services to the commissary industry, including vendors, manufacturers, and brokers. (Compl. at 4). In addition to shelf stocking, Top Gun provides in-store events, reclamation management, and logistical services required by vendors to operate military commissaries. (*Id.*). The agency at issue, DeCA, is the Government agency responsible for maintaining commissaries on military bases. (*Id*. at 1).

DeCA uses a process called "vendor stocking" to ensure grocery products from vendors are stocked appropriately on the shelves of military commissaries. (*Id*. at 3). Under that process, vendors who supply products are responsible for stocking those products on commissary shelves. (*Id.*). Vendor stocking is achieved by vendors contracting with third parties such as Top Gun. (*Id.*). There is no privity of contract between vendor stockers, such as Top Gun, and DeCA. (Pl.'s Resp. at 11). The obligation to stock products is contractual between the vendor and DeCA and is included in the Brandname Resale Ordering Agreement, the master contract between vendors and DeCA. (*Id.* (citing Compl. Ex. 11 at 58)). Under the terms of the Brandname Resale Ordering Agreement, vendors are responsible for delivering products to the designated delivery point. (Def.'s Mot., App. 2 (Mays Decl. ¶ 9)). While vendor stocking is a component of the delivery requirement agreed to by the vendors, costs for delivery and vendor stocking are not negotiated separately but are included in the total product unit price offered by vendors. (Def.'s Mot., App. 2 (Mays Decl. ¶ 10)).

DeCA is responsible for stocking the remainder of store products not stocked by vendors. (Def.'s Mot. at 9). Based on that need, DeCA issues service contracts for each store location to obtain various, comprehensive support services for the commissaries. (Def.'s Mot. at 9 (citing Def.'s Mot., App. 202) (Thomas Decl. ¶ 4)); Def.'s Mot., App. 110 (Russ Decl. ¶ 6)). Before those service contracts can be effectuated, DeCA must determine if there is a mandatory source, such as an AbilityOne procurement list, for the services before using competitive procedures. (Def.'s Mot. at 9 (citing Def.'s Mot., App. 202 (Thomas Decl. ¶ 5)); *see also* 48 C.F.R. §§ 8.002, 8.004).

*2.     Framework of AbilityOne and CICA*

The ten contracts at issue in this case are awarded under the AbilityOne Program. (Def.'s Mot. at 10). The Ability One Program was established by the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 8501–8506, to provide jobs to individuals with vision impairment and severe disabilities. Through the JWOD Act, Congress created the Committee for Purchase from People Who are Blind or Severely Disabled ("Committee") to administer the AbilityOne Program ("AbilityOne"). *See* 41 U.S.C. §§ 8502–03. The Committee's mandate is to identify programs and services furnished by qualifying nonprofit agencies that are suitable for government procurement. 41 U.S.C. § 8503. Congress also directed the Committee to designate central nonprofit agencies to assist in maintaining the Procurement List and to evaluate the suitability of qualifying nonprofit agencies. 41 U.S.C. § 8503(c).

2

Congress has restricted eligibility for the AbilityOne program to any "qualified nonprofit agency for the blind" and any "qualified nonprofit agency for other severely disabled." 41 U.S.C. §§ 8501(6), 8501(7), 8503(a)(1). Among other requirements, a "qualified nonprofit agency for other severely disabled" is a nonprofit agency that is "operated in the interest of severely disabled individuals who are not blind." 41 U.S.C. § 8501(6); *see also* 41 C.F.R. §§ 51-4.2 (procedures for initial qualification), 51-4.3 (procedures for maintaining qualification). The AbilityOne Commission maintains information specifically identifying the qualified nonprofit agency designated for each location. 41 U.S.C.A. § 8503(a)(1). For example, for the ten AbilityOne contracts at issue here, the qualified nonprofit agencies that can compete for the contracts are: Assets, Inc.; Brevard Achievement Center, Inc.; Challenge Enterprises of North Florida, Inc.; Great Plains Enterprises, Inc.; Job Options, Inc.; New Leaf, Inc.; PRIDE Industries; The Right 2 Work Corporation; and Trace, Inc. (Def.'s Mot., App. 208 (Jensen Decl. ¶¶ 8–11)); (*see also* Def.'s Mot., App. 209 (Jensen Decl. Attach. 1)). Notably, Top Gun is absent from the aforementioned list.

Once the Committee determines that a good or service is suitable for procurement from a qualified nonprofit agency, the Committee places that item on a published Procurement List and a federal agency wishing to obtain that item must do so through a qualified nonprofit agency. 41 U.S.C. § 8503. There are specific requirements and conditions that nonprofit agencies must satisfy to participate, and the Committee is required to maintain and publish in the Federal Register the list of products and services deemed suitable for procurement through AbilityOne. 41 U.S.C. § 8503(a). The Act does not define the suitability standard, but states that the Committee "may prescribe regulations regarding specifications for products and services on the procurement list . . . and other matters as necessary to carry out this chapter." 41 U.S.C. § 8503(c). Accordingly, the Committee promulgated regulations establishing mandatory criteria to determine the suitability of a commodity or service for the Procurement List. 41 C.F.R. § 51-2.4(a)(1)–(4) ("Determination of suitability"). After potential AbilityOne goods and services are identified and added to the Procurement List, the Committee members then consider the "particular facts and circumstances in each case" before deciding whether the good or service should be added to the Procurement List. 41 C.F.R. § 51-2.5.

In 1984, Congress enacted the modern statutory framework for Federal procurement, the Competition in Contracting Act of 1984, Pub. L. No. 98-369, div. B, tit. VII, 98 Stat. 494, 1175, which is codified, as amended, in various sections of titles 10, 31, and 41 of the United States Code (CICA). *See PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1348 (Fed. Cir. 2018). CICA generally requires that all executive agencies "obtain full and open competition through the use of competitive procedures" when procuring goods or services. *Id.* (quoting 41 U.S.C. § 3301(a)). An agency uses "competitive procedures" when it permits any responsible source to compete for a procurement; it also uses "competitive procedures" when it appropriately restricts competition to "small business concerns." *Id.* (quoting 41 U.S.C. § 152). Under CICA, 41 U.S.C. § 3301, AbilityOne procurements are considered "other than competitive" procurements, thus exempting them from the standard "full and open" competition. *See* 48 C.F.R. § 6.302-5; 10 U.S.C. § 2304(c)(5). While various other allegations are made, the sole cause of action alleged in Top Gun's Complaint is that DeCA's use of a sole source method in its vendor stocking decisions is a violation of the Competition in Contracting Act.

3.      *Contracts at Issue*

Between 1982 and 1994, the AbilityOne Commission added to the procurement list shelf stocking services at the ten locations at issue in this protest. These locations are: 1) the Anchorage Area Commissary, Elmendorf Air Force Base, AK (Anchorage); 2) the Fort Benning Commissary, Fort Benning, GA (Fort Benning); 3) the Fort Campbell Commissary, Fort Campbell, KY (Fort Campbell); 4) the Jacksonville NAS Commissary, NAS Jacksonville, FL (Jacksonville); 5) the Miramar Marine Corps Air Station Commissary, San Diego, CA (Miramar); 6) the Nellis AFB Commissary, Nellis Air Force Base, NV (Nellis); 7) the Norfolk Naval Station Commissary, Norfolk, VA (Norfolk); 8) the Pensacola NAS Commissary, Pensacola, FL (Pensacola); 9) the Randolph Air Force Base Commissary, Randolph AFB, TX (Randolph); and 10) the Naval Air Station Whidbey Island Commissary, Oak Harbor, WA (Whidbey Island). (Def.'s Mot. at 10 (citing Def.'s Mot., App. 209 (Jensen Decl., Attach. 1))). The procurement list identifies the scope of the services provided by the qualified nonprofit agency. (*Id.*). For Anchorage, Whidbey Island, Fort Benning, and Fort Campbell, the services identified are "Shelf Stocking & Custodial." (*Id.*). For the remaining six locations, the services are identified as "Shelf Stocking, Custodial, & Warehousing." (Def.'s Mot., App. 209 (Jensen Decl., Attach. 1))*.*

All store support services contracts, including the ten at issue in this protest, include a Performance Work Statement (PWS) that describes, among other tasks, the shelf stocking requirements. The PWS contains a paragraph titled "stocking exclusions" that provides categories of items that will not be stocked by the contractor. (Def.'s Mot., App. 301 (PWS ¶ 4.3.2.6)). However, the PWS also contemplates that store support contractors will stock such items as needed in order to prevent a not-in-stock situation during daytime stocking operations. (Def.'s Mot., App. 311 (Exhibit 4-1)); (Def.'s Mot., App. 307 (PWS ¶ 4.3.3.15.2)). Over the years, as the contracts with the nine nonprofit agencies at the ten locations listed above expired, DeCA resubmitted the requirement to SourceAmerica, renegotiated a fair market price, and issued a new contract. (Def.'s Mot., App. 205–06 (Thomas Decl. Attach. 1)).

Since March 2018, Top Gun alleges, and for the limited purposes of the pending motion the Court accepts as true, DeCA has awarded a growing number of shelf-stocking contracts directly to small companies without competition or oversight and later renewed those contracts. (Compl. at 4–5). It was at that time that, due to some sparsity among stocked products, DeCA began testing alternatives to vendor stocking, a practice which was publicly announced to vendors. (Def.'s Mot. at 13 (citing Def.'s Mot., App. 192 (Russ Decl. Attach. 3–6, Notices to Trade 18-29, 19-20, 19-24, and 19-60))). In early 2020, DeCA identified stores where it would transition shelf-stocking services from vendors to existing store support contractors. (Def.'s Mot. at 14; *Compare* Def.'s Mot., App. 311 (original PWS) *with* Def.'s Mot. App. 372 (revised PWS)). Each of the ten locations had an AbilityOne contract in place. (Def.'s Mot. at 14 (citing Def.'s Mot., App. 203–04 (Thomas Decl. ¶¶ 12, 14))). NTT 2020 states:

> The purpose of this notice is to provide an update to Industry on DeCA's initiative to explore alternatives to the current vendor stocking program. For the purpose of this announcement, vendor stocking is defined as those services for frequent delivery system (FDS) products not currently provided

4

by the DeCA commercial activity contractor or under direct store delivery (DSD) orders/deliveries.

DeCA will expand utilization of a third party to accomplish stocking of FDS brand name chill, frozen, and dry grocery products at the following commissary locations:

<table>
<tr><td><u>**August 1, 2020**</u></td><td><u>**September 1, 2020**</u></td></tr>
</table>

|   |   |
|---|---|
| • Anchorage | • Fort Campbell |
| • Fort Benning | • Miramar |
| • Jacksonville | • Whidbey Island |
| • Norfolk |   |
| • Nellis |   |
| • Pensacola |   |
| • Randolph |   |

(Def.'s Mot., App. 214).

Ten contract modifications were executed in July 2020, and performance of the modified work was scheduled to begin August 1, 2020, for seven locations and September 1, 2020, for three locations. (Def.'s Mot. at 14 (citing Def.'s Mot., App. 203 (Thomas Decl. ¶ 16))). It is the alternatives to vendor stocking that are at issue in this case.

## II.    Legal Standard

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4). Under this standard, an "award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

In this regard, the United States Court of Appeals for the Federal Circuit has explained that: "when a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'" *Id.* at 1332–33. "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430

U.S. 99 (1977). "The [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As long as there is "'a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to the RCFC Rule 12(b)(1), the Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The movant, however, may challenge the truth of any facts upon which jurisdiction depends. *See Raymark Indus. v. United States*, 15 Cl. Ct. 334, 338 (1988). If it does, the plaintiff must come forward with prima facie showing of jurisdiction. *Id.* The plaintiff cannot rely only on its allegations. *See Hornback v. United States*, 52 Fed. Cl. 374, 377 (2002). Moreover, the Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002). If the Court determines at any time that subject matter jurisdiction is lacking, it must dismiss the complaint. *See* RCFC 12(h)(3).

Standing is a threshold issue that implicates the Court's subject-matter jurisdiction. *Lujan*, 504 U.S. at 560–61. And so, if a plaintiff cannot establish standing, the Court is without jurisdiction to render a decision on the merits of a claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 323 (2015) (citing *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 94 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012)). Under the Tucker Act, the Court has jurisdiction over "an action by an interested party objecting . . . to an alleged violation of a statute or regulation with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In evaluating who qualifies as an interested party with standing to bring a bid protest

claim, the Court looks to the definition of "interested party" provided in CICA. *Myers*, 275 F.3d at 1370 (quoting *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see* 31 U.S.C. § 3551(2). And so, to have standing, a plaintiff must show that: "'it [(1)] is . . . an actual or prospective bidder and [(2)] . . . has a direct economic interest' in the procurement or proposed procurement." *Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017) (alterations in original) (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); *see also* 31 U.S.C. § 3551(2).

## III.   Analysis

In its Complaint, Top Gun accuses DeCA of improperly using the federal government's AbilityOne program to award shelf-stocking contracts without competition via sole source methods in violation of CICA. (Compl. at 8). Top Gun alleges that the results of the alternative testing demonstrated "unequivocally the failure of DeCA's Alternative Vendor Stocking program to achieve the desired outcome of increasing revenue." (Pl.'s Resp. at 12). Therefore, the decision to go forth with alternative vendor stocking was arbitrary and capricious. (Compl. at 17).  By the use of alternative vendor stocking, Top Gun claims that DeCA has deprived it of opportunity to compete for the work it is awarding through "its unreasonable disregard of acquisition law and regulation." (Compl. at 19). Through this suit, Top Gun seeks to block DeCA's plans to expand its "alternative stocking initiative" to the 10 above-mentioned commissaries. (Compl. at 19–20). Based on the foregoing, Top Gun alleges that DeCA's decision and intention to award the 10 contracts beginning August 1, 2020 via sole source methods is arbitrary, capricious, and an abuse of discretion.

The merits of Top Gun's claims are not before the Court at this juncture, thus, whether DeCA's decision was arbitrary and capricious will not be addressed. The sole issue before the Court is whether Top Gun possesses standing to challenge the modification of ten AbilityOne contracts awarded by DeCA on a sole source basis pursuant to the JWOD Act. (*See generally* Def.'s Mot.). The United States argues that Top Gun lacks standing because it is neither an actual or prospective bidder on those contracts nor does it possess a direct economic interest in the procurement. (Def.'s Mot. at 2). The Court agrees with the United States and finds that, because it is not a qualified nonprofit agency capable of receiving AbilityOne contracts, Top Gun lacks standing to challenge DeCA's actions, a jurisdictional prerequisite.

If Top Gun cannot establish standing, the Court must dismiss this matter for lack of subject-matter jurisdiction. *Myers*, 275 F.3d at 1369–70. To establish standing, Top Gun must show: (1) that it is "an actual or prospective bidder or offeror" and (2) that it has a "direct economic interest [which] would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2). An actual bidder is a party who has submitted a bid on a contract. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed. Cir. 2006). A party "who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation." *Id.* at 1308 (quoting *MCI Telecommunications Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989)). It is not enough for a party to perform similar services under other contracts, nor is it sufficient for a party to allege that "it might have submitted a bid in a competitive procurement." 275 F.3d at 1370. Rather, Top Gun must establish that it was a "qualified bidder." *Id.* at 1370–71. Thus, the Court must inquire as to whether the plaintiff could have competed for the contract at issue if the procurement process

were competitive. *Myers*, 275 F.3d at 1370. While a plaintiff need not show that it would have received the award in a competition, a plaintiff must show that it would have been a qualified bidder or offeror to establish standing. *Id*. at 1370–71. The mere fact that a protestor might have submitted a bid or offer, alone, is not sufficient to establish standing. *Id*.

In determining whether a plaintiff has a "direct economic interest" in the procurement, the Court generally applies the "substantial chance test," an inquiry as to whether the plaintiff would have had a substantial chance of winning the contract, but for the alleged error in the procurement. *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (Fed. Cir. 2013). The Federal Circuit has held that the "substantial chance" test applies in bid protests involving challenges to sole source awards. *Myers*, 275 F.3d at 1370; *see also Digitalis*, 664 F.3d at 1385 ("We see no reason to limit [the substantial chance test] to competitive procurements."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) ("When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award.").

Against the backdrop of the standards recited above, the Court must evaluate whether Top Gun could have competed for the ten contracts at issue if the procurement process for that contract had been competitive. *Myers*, 275 F.3d at 1370–71; *see also Orion*, 704 F.3d at 1349. When applying this test, for multiple reasons, the Court concludes that the answer to this question is "no." First, Top Gun has failed to establish that it is a qualified bidder. Second, Top Gun is not a nonprofit agency. (Def.'s Mot., App. 66 (Nuckols Decl. Attach. 1)). As iterated above, stocking of these ten commissaries falls within the purview of the procurement list governed by AbilityOne restrictions. The AbilityOne Program is restricted to any "qualified nonprofit agency for the blind" and any "qualified nonprofit agency for other severely disabled." 41 U.S.C. §§ 8501(6), 8501(7), 8503(a)(1). "[A] service that is added to the procurement list may only be contracted through the [qualified nonprofit agency] contractor selected by" the AbilityOne Commission. *Akima Intra-Data, LLC v. United States*, 119 Fed. Cl. 520, 545 (2014) (emphasis added). For the subject contracts, the qualified nonprofit agencies are: Assets, Inc.; Brevard Achievement Center, Inc.; Challenge Enterprises of North Florida, Inc.; Great Plains Enterprises, Inc.; Job Options, Inc.; New Leaf, Inc.; PRIDE Industries; The Right 2 Work Corporation; and Trace, Inc. (Def.'s Mot. App. 209 (Jensen Decl. Attach. 1)). Therefore, because the procurement of shelf-stocking services through the Procurement List is mandatory, and because Top Gun is not a qualified nonprofit agency, Top Gun is ineligible to receive any AbilityOne contracts or work on the Procurement List covered by those contracts.

As to the second element of § 3551(2), to demonstrate a "direct economic interest", a protester generally "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp.*, 316 F.3d at 1319. Top Gun has also failed to establish it would have had a substantial chance of winning the award because shelf-stocking services are still mandatory through the Procurement List. *PDS Consultants*, 907 F.3d at 1351. Further, Top Gun's allegations that the current nonprofit agencies violate the JWOD Act do not give it a substantial chance to win an award. Even if Top Gun could substantiate its allegations that "independent individual contractors without disabilities have been hired and/or told to apply for positions," (Pl.'s Resp. at

24), the shelf-stocking services are on the AbilityOne Procurement List and Top Gun does not qualify for a place on the Procurement List.

It is worth noting that, in both its Complaint and Response to the United States' Motion to Dismiss, Top Gun describes itself as "a company with no privity of contract with DeCA." (Compl. at 16; Pl.'s Resp. at 11). As cited by Top Gun, the definition of "interested party," in CICA as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," dictates the outcome of this motion. However, there is no situation where Top Gun would have been an actual or prospective bidder or offeror to these contracts directly. Based on the foregoing, Top Gun has not adequately refuted that the contracts at issue are improperly characterized as AbilityOne contracts. Because it is not a qualified nonprofit agency or the holder of any DeCA contracts as a manufacturer vendor or a qualified nonprofit agency, Top Gun does not have standing to challenge the United States' award of those contracts.

## IV.   Conclusion

The Court finds that Top Gun has failed to establish standing and consequently, the Court does not possess subject-matter jurisdiction to render a decision on the merits of its claim. Therefore, the Court **GRANTS** the United States' Motion to Dismiss pursuant to RCFC 12(b)(1).

The Court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. By no later than October 26, 2020, the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the Court's ruling containing proposed redactions, with all proposed redactions clearly indicated. The parties also shall, by the same date, file any redacted versions of documents they filed under seal in this case to the extent such redacted versions have not already been filed.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/      David A. Tapp
DAVID A. TAPP, Judge